Filed 12/12/24  In re Z.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re Z.B., a Person Coming Under the Juvenile Court Law. | C100558 |
| THE PEOPLE, | (Super. Ct. No. JV141572) |
| Plaintiff and Respondent, | |
| v. | |
| Z.B., | |
| Defendant and Appellant. | |

The juvenile court committed 16-year-old Z.B. to Valley Oak Youth Academy (VOYA), a secure youth treatment facility (Welf. & Inst. Code, § 875, subd. (a)),[1] setting

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

a baseline term of confinement of three years and the maximum term of confinement of 16 years, with 315 days of custody credit.

Z.B. now contends the juvenile court abused its discretion in ordering a secure youth treatment facility commitment. We conclude the juvenile court did not abuse its discretion in committing Z.B. to VOYA and affirm the judgment.

## I. BACKGROUND

In January 2022, the People filed a wardship petition alleging that Z.B. (then 14 years old) slapped L.V. on her buttocks after a high school class, and then later approached her from behind, choked her until she could not breath, punched her in the face and chest, and threatened L.V. and her family to keep them from reporting the incident. The juvenile court placed Z.B. on electronic monitoring. In February 2022, electronic monitoring was discontinued. In June 2022, Z.B. admitted felony assault and misdemeanor sexual battery. Z.B. was adjudged a ward of the juvenile court and released with an order to complete 24 hours of community service and sexual boundaries counseling.

In November 2022, the People filed another wardship petition charging Z.B (now 15 years old) with felony grand theft after taking property (video game consoles) from Target and fleeing the store. Z.B. was again released and placed on electronic monitoring. In January 2023, the People filed a petition alleging Z.B. violated probation when he stole from Target. Z.B. thereafter admitted misdemeanor grand theft as a violation of probation. The juvenile court continued Z.B. as a ward of the juvenile court, discontinued electronic monitoring, and released Z.B. to the custody of his mother.

In February 2023, the People filed a petition alleging three probation violations by Z.B.: he failed to reside in Sacramento County and moved out of their jurisdiction without probation's permission, violated conditions of electronic monitoring, and failed to complete sexual boundaries counseling. Z.B. was released to his mother's care and

placed on electronic monitoring. Z.B. failed to appear for a March 2023 settlement conference and a bench warrant was issued for his arrest.

In early April 2023, the People filed a wardship petition charging Z.B. with felony vandalism for throwing a rock and damaging a car and resisting arrest, and a parallel violation of probation petition. At the prosecution's request, the wardship petition was dismissed and the case proceeded on the February 2023 and April 2023 probation violation petitions.

On April 12, 2023, the People filed a fourth wardship petition alleging four felony counts and gun use enhancement allegations (Pen. Code, § 12022, subd. (a)(1)) arising from a February 2023 home invasion robbery. Z.B. entered the backyard of the victims' residence armed with a handgun and encountered one victim, whom he ordered into the residence. Inside the residence, Z.B. encountered the victim's daughter. Z.B. ordered the victim and his daughter to sit on the bed. Z.B. ordered the daughter to hand over money she was holding and then slapped her and threatened to shoot her when she refused. The daughter gave Z.B. the money, and he left, taking a video game, a cell phone and other items, as well as smashing another cell phone. The juvenile court ordered Z.B. detained at juvenile hall.

In an amended wardship petition filed on April 17, 2023, the People added four counts of child molestation arising from a December 2022 incident. Z.B. and the 11-year-old victim were at a family member's home when Z.B. put his hands in the victim's pants then pulled her pants down and inserted his penis in her vagina. The victim attempted to push Z.B away but he brushed her hand off and continued. Z.B. also penetrated the victim's vagina with his fingers. Z.B. stopped when an adult entered the room, but later in the day he forced the victim's hand down his pants, made her touch his penis, and forced her to orally copulate him. The same day Z.B. and the victim were lying on a couch watching television in a different location. Z.B. pulled the victim's pants down and inserted his penis into her vagina, causing her pain and vaginal bleeding.

3

The juvenile court dismissed the April 12 petition, filed the April 17 petition, and ordered Z.B. to remain detained at juvenile hall.

In June 2023, defense counsel asked that Z.B. be released on electronic monitoring. The prosecutor opposed the request, pointing out that most of Z.B.'s offenses had occurred while he was on electronic monitoring and confirming with the probation department that Z.B. had collected 14 disciplinary reports in juvenile hall since his last court date. The juvenile court denied Z.B.'s request. The court also denied Z.B.'s counsel's subsequent requests for release on electronic monitoring.

On August 31, 2023, the People filed a second amended wardship petition which amended the gun use enhancement allegation in count two (Pen. Code, § 12022, subd. (a)(1)) to allege personal use of a firearm (Pen. Code, § 12022.53, subd. (b)). The juvenile court dismissed the April 17 amended petition as superseded.

At a hearing in September 2023, counsel for Z.B. argued for his release on electronic monitoring because Z.B. had shown substantial improvement in juvenile hall, to which the prosecutor responded that, since Z.B. has been at juvenile hall, "he has consistently had behavior issues." The juvenile court denied the request. The court ordered a psychological evaluation under Penal Code section 288.1—required as a condition of probation for a defendant convicted of a lewd and lascivious act on a child under 14—and set the matter for trial.

On December 4, 2023, Z.B. admitted the charge of felony residential robbery in concert (Pen. Code, § 212.5/213—count two) in the second amended wardship petition, as well as the firearm enhancement (Pen. Code, § 12022.53, subd. (b)). The remaining counts were "dismissed in the interest of justice in light of the plea with consideration."[2] The trial court set a contested disposition hearing.

---

[2] "[T]he statutory scheme contemplates consideration of all available reliable, social and behavioral evidence bearing upon the minor's fitness in reaching the placement

4

Z.B.'s counsel filed a disposition memorandum. Counsel argued that prior to the charged conduct Z.B. and his mother lacked a stable residence. Counsel noted that the current offense was only Z.B.'s second incident of criminal behavior before the juvenile court and claimed that Z.B. had a minimal number of conflict incidents while detained at juvenile hall. Counsel contended that VOYA commitment, if recommended by the probation department, would mean the juvenile court could not consider a less restrictive, alternative disposition, which the defense proposed in the form of continued probation. Moreover, defense counsel asserted, because a less restrictive, alternative disposition to commitment had never been attempted, under section 875, subdivision (a)(3), the juvenile court must not commit Z.B. to a secured youth treatment facility.

In a report submitted a week before the hearing, the probation department recommended commitment to VOYA. The report summarized Z.B.'s offenses and noted that at juvenile hall Z.B. had collected 31 incident reports since his detention on April 4, 2023. The report further noted that according to the psychological evaluation of Z.B. conducted by two psychologists, Z.B. was at moderate to high risk to other children for general and sexual offenses. The evaluation concluded that, while Z.B. did not need a residential sex offender treatment program, he did need a formal sex offender treatment program, with 24-hour supervision while Z.B. is in the community, due to his history of absconding and noncompliance with previous sexual offender treatment.

Based on an interview of Z.B., the probation department assessed him as high risk to reoffend. Z.B. reported that his adjustment to probation was good until he started to experience housing issues in June 2022. Z.B. would stay in different hotels for a few

decision," and "a minor can have no reasonable expectation the conduct underlying dismissed allegations will not be looked to as a factor in deciding the appropriate placement." (*In re Jimmy P.* (1996) 50 Cal.App.4th 1679, 1681; see also *In re T.C.* (2009) 173 Cal.App.4th 837, 842 [waiver under *People v. Harvey* (1979) 25 Cal.3d 754 "not required when using dismissed allegations in determining an appropriate juvenile disposition"].)

days with his mother or relatives, but family members did not want the probation department at their homes. His mother would sometimes stay with him but also be absent for days at a time. Z.B. attributed his positive drug tests to being around family who use marijuana. Z.B. reported that he does not like counseling and does not believe he needs it, but he will do what is necessary to get off probation. Regarding school, Z.B. did not attend school from November 2022 to April 2023 due to absconding. Prior to absconding, he was expelled from school for sexual battery and assault, and he was also suspended for fighting and recording fights. Z.B. stated that his accomplice in the robbery was a friend from school, but Z.B. denied entering the victim's home.

Finally, the probation department described the intake assessment process and treatment programs available at VOYA that would benefit Z.B., including behavior treatment interventions, cognitive behavioral interventions for substance abuse, mental health treatment, sexual behavior treatment, post-secondary education opportunities, vocational programs, and reentry.

At the contested disposition hearing, Z.B.'s counsel argued the probation report was slanted, and, along the lines of her brief, that a less restrictive alternative to commitment to a secure youth treatment facility was appropriate, adding that Z.B. had engaged in many rehabilitative programs at juvenile hall. The People disagreed, contending that VOYA commitment was appropriate given, among other things, Z.B.'s offenses and his behavior at juvenile hall. The People also argued that a VOYA commitment would best meet Z.B.'s needs, as well the goals of rehabilitation and community safety.

The trial court agreed with the People and committed Z.B. to VOYA. Addressing Z.B., the court concluded: "[I]n considering all of the factors that the law requires, the severity of the offenses, the previous delinquent history, whether the programming in VOYA, which is different, and which I think can be tailored to the needs that you have, and to where you're at in terms of moving through this programming. I think that

6

[defense counsel] makes very compelling arguments, and the law does require that I consider whether there are less restrictive alternatives, but I think our experience in the community, even now with some of the additional programs that may be available, I don't think that in light of everything that I have a duty to consider [a less restrictive alternative] would be appropriate. [¶] So the Court will adopt the findings and recommendations of the Probation Department."

The findings of the probation department included that Z.B.'s parent is not capable of or neglected to provide maintenance and training of Z.B., probation and custody of his parent has been tried and Z.B. failed to reform, and the juvenile court has considered all relevant and material evidence including the recommendations of the probation department, counsel, and individuals designated to advise the court. The probation department's findings also stated that the juvenile court has considered all the disposition criteria set forth in section 875, subdivision (a)(3)(A)-(E), including "[w]hether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court."

The juvenile court set Z.B.'s baseline term of confinement (§ 875, subd. (b)) at three years and the maximum term of confinement (§ 875, subd. (c)) at 16 years, with 315 days custody credit.

Z.B. filed a timely appeal.

## II. DISCUSSION

Z.B. asserts the juvenile court abused its discretion in ordering a VOYA commitment, because his offense, while serious, occurred during a five-month period of family and housing instability, and his behavior improved dramatically in the structured environment of juvenile hall. Z.B. further claims there was insufficient evidence to support a VOYA commitment as appropriate to Z.B.'s needs, and the goals of rehabilitation and community safety could have been achieved in a less restrictive

7

placement. We conclude the juvenile court did not abuse its discretion, as its determination was supported by substantial evidence.

" ' "We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision." [Citation.] " '[D]iscretion is abused whenever the court exceeds the bounds of all reason, all of the circumstances being considered.' " [Citation.] We will not disturb the juvenile court's findings when there is substantial evidence to support them. [Citation.] " 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " ' [Citation.] 'A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.' " (*In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288.) "The purpose of the juvenile court is to protect both the minor under its jurisdiction and the public, and to preserve and strengthen the minor's family ties whenever possible. [Citations.] Central to the juvenile court's mission are the care, treatment, guidance, and rehabilitation of the delinquent juvenile." (*In re Walter P.* (2009) 170 Ca.App.4th 95, 99; see § 202, subds. (a) & (b).)

A juvenile court may order that a minor be committed to a secure youth treatment facility for a period of confinement if, among other things, the "court has made a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (§ 875, subd. (a)(3).) In making such a commitment determination, the juvenile court must consider: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met

8

by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subd. (a)(3)(A)-(E).)

Consistent with the statute, the juvenile court considered the first factor, the severity of the current offense. (§ 875, subd. (a)(3)(A).) Z.B. acknowledges that his offense of first degree robbery was indeed severe. As summarized in the probation report, the victim saw Z.B. walk up to the house and heard him climb the backyard fence. The victim went out to check the backyard and saw Z.B pointing a handgun at him. Z.B. ordered the victim inside the house. The victim's daughter was inside. The victim reported that Z.B. pointed a firearm at his daughter's head, demanded money, hit her on the side of the face, and told her she had five seconds to give him her money. According to the victim's daughter, Z.B. ordered the victim and his daughter to sit on the bed in her bedroom and not move. When she refused, Z.B. slapped her in the face and threatened to shoot her in five seconds if she did not listen. The daughter gave Z.B. $2,000 in cash. Z.B. continued to aim the gun at the victims while he stole the daughter's video game console, a True Religion belt, and other items that Z.B. placed in a backpack. Z.B. also stole the victim's cell phone, destroyed his daughter's cell phone, and fled the home. Z.B. committed the robbery while wearing electronic monitoring equipment. The victim's daughter's mother reported Z.B.'s actions were "brazen," having occurred in the middle of the day. She further reported that her daughter "has suffered the most and feels vulnerable and exposed" and may seek counseling in the future.

The juvenile court also considered Z.B.'s previous delinquent history. (§ 875, subd. (a)(3)(B).) This history included the December 2022 incident where Z.B. inserted his penis in the vagina of an 11-year-old, learning-disabled girl and later made her orally copulate him. As described in the probation report, other children were in the room at the

9

time of the oral copulation, and Z.B. was holding his infant sister. According to the victim's mother, although the victim is in the fifth grade, she is at the second-grade level intellectually speaking. Z.B. was on an ankle monitor at the time of the offenses. Z.B.'s history also includes numerous probation violations while Z.B. was on electronic monitoring, such as an incident in April 2023 where Z.B. was in a group of juveniles assaulting an elderly person, and he threw a rock breaking the car window of someone who photographed the assault.

As to attempts to rehabilitate Z.B., the probation department reported that the juvenile court ordered Z.B. to complete sexual boundaries training, which he did not do, and stated that he does not like counseling, does not believe he needs it, and participates only to satisfy the juvenile court. In addition, Z.B.'s adjustment to probation was generally extremely poor given his recidivism and failure to complete community service. Z.B. also submitted two drug tests that were positive for marijuana. His mother reported that Z.B.'s behavior at home "is horrible"—he becomes physically aggressive and leaves home without her knowledge and against her wishes. Attempts to hold Z.B. accountable with intermediate sanctions were unsuccessful as he repeatedly violated electronic monitoring.

Z.B., however, characterizes his delinquent behavior as an aberration and escalation that occurred in the context of family and housing instability from December 2022 to April 2023. Z.B. argues his behavior improved substantially when he was incarcerated in the "stable, therapeutic environment" of juvenile hall. The record does not support this argument. The probation department reported that as of October 10, 2023, Z.B. had approximately 31 incident reports at juvenile hall for staff disrespect and behavior "uncharacteristic of an Honor level."[3] Z.B.'s negative behaviors included "staff

---

[3] Z.B.'s counsel emphasized at the hearing that he was at the "Honor" level in juvenile hall since July 9, 2023. As a court officer explained to the juvenile court, Z.B. "failed to

10

disrespect, creating an unsafe environment, threatening staff, disruptive school behavior, peer agitation, excessive point loss, horseplaying, constant disruption, failure to follow instructions, non-compliant behavior, distributing an inappropriate image, and school suspension," with the "most egregious behaviors" also involving "destruction of school property, inappropriate comments to peers, yelling, arguing with staff, touching other residents, and aggressive and agitated behavior towards staff." Contrary to Z.B.'s claim, his conduct in juvenile hall appears consistent with his delinquent behavior when released.

The juvenile court also considered whether the VOYA programming, different from what Z.B. was receiving in juvenile hall, could be "tailored" to his needs, as well as his stage in programming participation. (§ 875, subd. (a)(3)(C).) The probation report contained pages-long discussions of the VOYA secure youth treatment facility. These discussions included an overview and a discussion of the ward's probable benefit, including subsections addressing mental health treatment programs, sexual behavior treatment program, academics, vocational matters, and reentry.

The juvenile court acknowledged that "the law does require that I consider whether there are less restrictive alternatives," but observed that "experience" with Z.B.'s conduct in the community, even with available programs, indicated a less restrictive alternative would not be appropriate. (§ 875, subd. (a)(3)(D).) As mentioned, the probation report stated Z.B. had not completed sexual boundaries counseling and showed little indication that he would in the future. According to two psychologists, Z.B. was not in need of a residential sex offender treatment program, but he did need a treatment program and must be supervised 24 hours a day while in the community due to his history of absconding and noncompliance with sex offender treatment. The juvenile

earn points on almost a daily basis" at juvenile hall, but this would not cause him to lose honor status, which would require greater misconduct, such as a fight.

11

court and probation department plainly were not able to supervise Z.B., let alone for 24 hours a day. Indeed, Z.B. committed multiple additional offenses since becoming a ward of the juvenile court, two while he was on electronic monitoring. Z.B.'s mother proposed that he be returned to her custody with electronic monitoring and that she would supervise him since he would reside with her. However, Z.B.'s mother and relatives with whom Z.B. had been staying were not able to supervise him and electronic monitoring had little to no effect on his delinquent behavior. Substantial evidence supported the juvenile court's determination that a less restrictive alternative than VOYA would not be appropriate.

Lastly, with regard to addressing Z.B.'s "age, developmental maturity, [and] mental and emotional health . . . affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility" (§ 875, subd. (a)(3)(E)), the probation report indicated Z.B. had reached the point in his developmental maturity where a term of commitment in VOYA was the most suitable solution. As the probation report stated, Z.B.'s "prior and current delinquent behavior demonstrates criminal sophistication." Z.B. attempted to persuade the 11-year-old victim and her family not to report the December 2022 incident, reflecting his understanding of the consequences of a sexual offense after his adjudication for sexual battery in June 2022. The current offense for first degree burglary was not only a brazen, midday home invasion by Z.B. with an accomplice, but Z.B. appeared to have prior knowledge of the victims' home or valuables, since he seemed to know exactly what he wanted to take, which suggested planning. Nothing in the probation report indicated that Z.B. suffered from trauma that made him unsuitable for a VOYA commitment. While the probation report documented his need for and resistance to sex offender treatment, this did not negatively affect the suitability of a VOYA commitment. To the contrary, sex offender treatment at VOYA was more likely to be effective since Z.B. could not abscond or otherwise fail to comply with a treatment program in that structured environment.

Nonetheless, Z.B. asserts that juvenile hall was meeting his treatment and security needs and moving him to a secure youth treatment facility would traumatize him in this "harsh and restrictive reformatory environment" where he would be exposed to "older, more sophisticated, juveniles and ultimately impair his prospects for rehabilitation." Z.B. ignores the probation department's conclusion that his current and prior crimes already demonstrated "criminal sophistication." Z.B. further disregards his own statements to probation rejecting the counseling he received from December 2022 until October 2023, which includes time when he was detained at juvenile hall. Z.B. also expressed to the probation department that "he does not want to return to Juvenile Hall." In short, we find nothing in the record that indicates Z.B. would be traumatized simply by moving from juvenile hall to VOYA or that his rehabilitation would be impaired thereby.

We find *In re Carlos J.* (2018) 22 Cal.App.5th 1 and *In re Calvin S.* (2016) 5 Cal.App.5th 522, on which Z.B. relies, inapposite. In *Carlos J.*, the record contained no evidence of programs available to benefit the minor in the Division of Juvenile Justice.[4] (*In re Carlos J., supra,* at pp. 10-12.) Here, the probation department enumerated the programs at VOYA that would benefit Z.B. by addressing, inter alia, his mental health, sexual behavior, academic, vocational, and reentry needs. No similar evidence was presented in *Carlos J.* (*Ibid.*) Likewise, we are not persuaded by Z.B.'s argument, relying on *Calvin S.*, that the record lacks sufficient support for the juvenile court's determination that less restrictive alternatives would be ineffective and inappropriate. In *Calvin S.*, the only information in the record to support the juvenile court's rejection of a juvenile hall placement for the minor was "the court's statement that

---

[4] Division of Juvenile Justice was formerly "the state's most restrictive placement for its most severe juvenile offenders." (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902.) The county-level equivalent of Division of Juvenile Justice is a secure youth treatment facility. (§§ 875, 875.5.)

juvenile hall is 'not a treatment center,' but 'a detention center.' " (*Calvin S., supra*, at pp. 528-529.) The appellate court concluded this was not substantial evidence to support a finding that keeping the minor confined in juvenile hall would be ineffective or inappropriate. (*Id.* at p. 528.) The circumstances here are not like those in *Calvin S.* Z.B.'s record of disciplinary incidents at juvenile hall and his rejection of counseling he was receiving in the period during which he was detained there demonstrated that juvenile hall was not a workable alternative to the treatment and programs at VOYA.

Substantial evidence discussed above supports the court's commitment of Z.B. to a secure youth treatment facility. Accordingly, the juvenile court did not abuse its discretion.

### III. DISPOSITION

The disposition order is affirmed.

/S/

_____

RENNER, J.

We concur:

/S/

_____

EARL, P. J.

/S/

_____

KRAUSE, J.

14